**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS COSTA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 17 CV 5068** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Michael T. Mason, United States Magistrate Judge:

Plaintiff Thomas Costa ("Claimant") filed a motion for summary judgment seeking to reverse the final decision of the Commissioner of Social Security ("the Commissioner") denying his claim for disability insurance benefits ("DIB"). The Commissioner has filed a cross-motion for summary judgment asking the Court to uphold the Commissioner's final decision. For the reasons set forth below, Claimant's motion for summary judgment (Dkt. 12) is granted insofar as it requests remand for further proceedings, and the Commissioner's motion for summary judgment (Dkt. 20) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**I. Background**

**A. Procedural History**

On May 28, 2013, Claimant filed an application for DIB, alleging disability beginning July 15, 2010 due to severe depression and migraines. (R. 60, 70, 88, 187.)

The Social Security Administration ("SSA") denied Claimant's application initially on September 23, 2013, and upon reconsideration on May 20, 2014. (R. 70, 83-88, 93-96.) An Administrative Law Judge ("ALJ") held an administrative hearing on December 8, 2015. (R. 32-59.) On February 3, 2016, the ALJ issued a written decision denying Claimant's DIB application. (R. 15-31.) The Appeals Council denied review on May 23, 2017, making the ALJ's decision the final decision of the Commissioner. (R. 1-5); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

### B. Relevant Medical Evidence

#### 1. Treating Sources

In April 2010, Claimant saw Veena Prabhu, M.D. at DuPage Internal Medicine for consultation and prescriptions. (R. 226-27, 429-32.) Thereafter, he visited DuPage Internal Medicine two more times, in July 2010 and August 2011. (R. 427-28.) Claimant characterized this treatment as providing evaluation and medication for all impairments. (R. 226-27.)

From July 2012 (at the latest) through April 2014, Claimant was treated at 83rd Professional Group ("83rd Professional") for his depression by psychiatrist Talat Ghaus, M.D. and social worker Annette Ochs. [1] (R. 190, 223, 288-300, 332-39.) The record indicates that Claimant visited 83rd Professional 22 times over this span (generally on a monthly basis). (R. 288-300, 332-39.) In November 2013, Dr. Ghaus completed a medical source statement. (R. 222-24.) In Dr. Ghaus's opinion, Claimant's depression

---

[1] The April 2010 progress note from DuPage Internal Medicine suggests that Claimant was seeing Dr. Ghaus at that time, and Claimant reported that he started seeing Dr. Ghaus (or Ms. Ochs) as early as 2005. (R. 234, 429.) The earliest progress note from 83rd Professional in the record, however, is from July 2012. (R. 300.)

met or equaled different aspects of the criteria for Listing 12.04 from the Listing of Impairments,[2] which, at the time, was "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." (R. 222-23.) One of these aspects included a current history of being unable, for one year or more, to function outside a highly supportive living arrangement. (R. 223.) Dr. Ghaus further explained that Claimant experienced high and debilitating levels of anxiety and chronic symptoms of depression, including depressed mood, hypersomnia, low energy, lack of motivation, low self-esteem, poor concentration, inability to make decisions, and an inability to function outside of his home. (R. 222-23.)

On five occasions from August 2012 through March 2014, Claimant presented to Sean Miran, D.O., a physician specializing in family medicine. (R. 191, 218, 220, 268-86, 305-10.) Although Claimant initially presented to Dr. Miran for migraines, he also saw Dr. Miran for maladies unrelated to his migraines. (*See* R. 191, 226, 268-86, 308-10.) In November 2013, Dr. Miran completed a "Headache/Migraine Residual Functional Capacity Questionnaire." (R. 218-20.) According to Dr. Miran, Claimant experienced day-long migraines two to three times per week and needed to lie down in a quiet room for six to eight hours to rid himself of the migraine. (R. 219.) Dr. Miran also opined that Claimant might "need breaks at unpredictable intervals during" the workday and that he was likely to miss work more than four times per month due to his impairments or treatment. (R. 220.)

---

[2] The Listing of Impairments lists different "impairments that are considered presumptively disabling when a claimant's impairments" meet or equal the criteria described by a specific listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999); *see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1.

In February 2015, Claimant began seeking treatment for his "depressive and anxiety symptoms" from Ibrahim Khala, M.D., a psychiatrist with the DuPage County Health Department. (R. 375, 380.) Dr. Khala treated Claimant from February 2015 to August 2015. (R. 355-80.) The record also indicates that Claimant presented to Ather Malik, D.O., his primary care physician, in December 2014 and May 2015, apparently for treatment of his scalp dermatitis. (R. 394-95, 423-24; *see also* R. 21 (noting that Claimant was treated in 2015 for scalp dermatitis and citing Exhibit 10F, which contains the cited encounter notes).)

### 2. Agency Consultants

In September 2013, at the initial stage of review for Claimant's DIB claim, two agency consultants, Young-Ja Kim, M.D. and Ann Lovko, Ph.D., reviewed Claimant's medical records and opined about his physical and mental impairments and limitations. (R. 60-69.) In May 2014—after Drs. Miran and Ghaus had offered their opinions— another pair of agency consultants, James Hinchen, M.D. and Russell Taylor, Ph.D., reviewed Claimant's medical records and opined about his impairments and limitations at the reconsideration level of review. (R. 71-82.)

The medical consultants, Drs. Kim and Hinchen, both opined that although Claimant should avoid concentrated exposure to hazards such as machinery and heights, he otherwise had no physical limitations. (R. 64-65, 77.) The psychological consultants, Drs. Lovko and Taylor, both opined that Claimant had severe migraines and affective disorders that mildly restricted his activities of daily living and caused moderate difficulties in his ability to maintain social functioning and concentration, persistence, or pace. (R. 62-63, 75.) Drs. Lovko and Taylor similarly agreed that

Claimant was moderately limited in his ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without psychologically-based interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 65-66, 78-79.) Ultimately, though, both Drs. Lovko and Taylor believed that Claimant could "manage the stresses involved with work." (R. 67, 80.)

### C. Claimant's Hearing Testimony

Claimant testified at the December 8, 2015 hearing that he had not worked since 2010, when he believes he became disabled. (R. 35.) His migraines, anxiety attacks, and depression keep him from working. (R. 36.)

Claimant testified that his migraines are related to stress, his temperament at the time, and the weather, and that his tension and anxiety often turn into a migraine. (R. 41.) He generally experiences one migraine every week, although it varies (for example, he might go a week without a migraine and then have two migraines in a week). (R. 41, 49.) Each migraine lasts at least three hours, and it may last until the next day. (R. 40, 49.) On average, Claimant is sidelined for six to twelve hours by migraines every week, although on a good week he may only experience one, three-hour migraine. (R. 49.) For his migraines, Claimant takes Sumatriptan as needed, which means at least once a week, and as many as two or three times a week. (R. 43.)

After taking his migraine medication, Claimant "could be up and moving again in three hours," or he "could be down until the next day." (R. 43.)

Claimant also has daily panic attacks, which can last anywhere from 15-20 minutes to several hours. (R. 46, 49.) On average, Claimant is sidelined by these anxiety attacks for three hours per day. (R. 49.) He sees Dr. Khaja and a therapist for his panic attacks. (R. 46-47.) They instruct Claimant to regularly take his medications, and they permit him to take an extra dose if he is having a bad panic attack. (R. 47.) Although Claimant's medication helps, his anxiety attacks still occur quite frequently. (R. 43.)

Claimant lives with his parents, who also have significant health issues; his mother has Parkinson's disease and is at risk to fall when walking, and his elderly father has suffered a stroke and underwent a bypass in the past. (R. 36, 39.) Claimant assists his parents by doing most of the chores for the three of them, including cleaning, sweeping, laundry, and shopping. (R. 39-40.) But he has problems keeping up with these chores, and he needs to take a lot of breaks. (R. 40, 52.) Claimant testified that his days seem to be constantly interrupted by anxiety attacks, which are sometimes overwhelming. (R. 40.) He must "build up the energy to go" out and shop or run errands; for example, an errand that should take a half hour instead takes a couple of hours. (*Id.*) He often feels exhausted after four hours and then must lie down for another two or three hours. (*Id.*) As such, he never really knows when he'll be able to make it to the store. (*Id.*) On average, Claimant sleeps 10 hours per night, and he testified that it was not unusual for him to sleep for 24 hours. (R. 50.) He does not have

a lot of energy and has some difficulty concentrating, as he is always dwelling on the past and worrying about the future.  (R. 50-51.)

As for hobbies, Claimant takes care of his dog, reads, works on fixing an old computer, watches television, and talks to friends and siblings when he can.  (R. 41-42.) Since July 2010, he has not taken any trips except for a one-week trip where he drove with a friend to and from Arizona.  (R. 37, 48-49.)  Claimant, who does not have any problems driving, drove about one-fifth of the time during the trip.  (R. 37-38.)  Claimant went so that he could look after and take care of his friend's mother, while his friend went to the hospital to visit his sick father.  (*Id.*)  Claimant went because he felt it was something he was "obligated to do for a friend who needed me at that time."  (R. 48-49.) On the way to Arizona, Claimant experienced a migraine so severe that it caused him to throw up and stop for the night.  (R. 38-39.)

At the time of the hearing, Claimant was taking Paxil, Lamotrigine, Clonazepam, and Sumatriptan.  (R. 43.)  The medication often made him feel exhausted and like he is in a bit of a fog when he wakes up.  (R. 43-44.)  The Clonazepam also affected his balance.  (*Id.*)  Claimant also testified that he last used marijuana several years ago. (R. 51.)  When questioned by the ALJ about an August 2015 doctor's report that purportedly said that he was using marijuana, Claimant responded "[t]hat I had" in the past.  (*Id.*)  On subsequent questioning from his attorney, Claimant testified that he did not use marijuana in August 2015.  (R. 51-52.)

### D.  Vocational Expert Testimony

A vocational expert ("VE") also offered testimony at the hearing.  (R. 54-58.)  The ALJ asked the VE to consider a college-educated individual who could occasionally be

exposed to hazards, such as dangerous moving machinery or unprotected heights; was unable to understand, remember, and carry out detailed instructions because of moderate limitations in concentration, but retained the concentration necessary for simple, routine work; was unable to perform work requiring a production or assembly line pace, but could perform work permitting a more flexible pace; and was only permitted to have occasional, brief, and superficial contact with supervisors, coworkers, and the general public due to moderate difficulties with social functioning.  (R. 56-57.) The VE testified that a hypothetical individual with these limitations could not perform Claimant's past work, but he could work as a laundry worker, inspector, or a sorter.  (*Id.*) If this hypothetical individual was also absent from work five or more days per month, that would preclude all employment, as employer tolerances for absences are one occurrence or less per month.  (R. 57-58.)  The VE also testified that any individual who was off-task more than 15 percent of the day would be unemployable.  (R. 58.)

## II.  Analysis

### A.  Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (citations and quotations omitted).  Although this Court must consider the entire administrative record, it will "not 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner.'"  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d

535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a 'critical review of the evidence'" and will not let the Commissioner's "decision stand 'if it lacks evidentiary support or an adequate discussion of the issues.'" *Id.* (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure [the Court] that the ALJ considered the important evidence . . . [and to enable the Court] to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis Under the Social Security Act

To qualify for DIB, a claimant must be "disabled" under the Social Security Act (the "Act"). *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether [he] can perform past relevant work, and (5) whether the claimant is capable of

performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing disability at steps one through four. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

The ALJ here followed this five-step inquiry. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity from his alleged disability onset date, July 15, 2010, through his date last insured ("DLI"), December 31, 2013 (the "Relevant Period.") (R. 18, 20.) At step two, the ALJ determined that, during the Relevant Period, Claimant suffered from the following severe impairments: bipolar disorder, anxiety disorder, and migraine headaches. (R. 20.) At step three, the ALJ concluded that, Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1). (R. 21.)

Next, the ALJ assessed Claimant's residual functional capacity ("RFC"), which "is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The ALJ found that Claimant could have performed a full range of work at all exertional levels but that he was restricted by nonexertional limitations stemming from his mental impairments and migraines. (R. 23.) Due to these nonexertional limitations, Claimant could "have no more than occasional concentrated exposure to hazards such as dangerous moving machinery or unprotected heights"; he "lacked the ability to understand, remember, and

carry out detailed instructions because of his moderate limitations in concentration, but he retained the sustained concentration necessary for simple work of a routine type"; he "would not have been able to perform work requiring a production or assembly line pace, but he would have been able to perform work permitting a more flexible pace"; and he could have "no more than occasional brief and superficial contact with supervisors, co-workers, and the general public because of his moderate difficulties in social functioning." (*Id.*) Then, at step four, the ALJ concluded that Claimant could not have performed any of his past relevant work. (R. 26.) At step five, though, the ALJ determined that there were jobs existing in significant numbers in the national economy that Claimant could have performed, such as laundry worker, inspector, or sorter. (R. 26-27). As a result, the ALJ found that Claimant had not been disabled at any time during the Relevant Period. (R. 27.)

On appeal, Claimant argues that the ALJ (1) failed to appropriately weigh the medical opinions of his treating physicians; and (2) improperly evaluated his credibility and subjective symptoms.[3] The Court addresses each argument below.

### C. Remand is Required Because the ALJ Did Not Adequately Evaluate the Opinions of Claimant's Treating Physicians.

Claimant asserts that the ALJ did not provide good reasons for rejecting the opinions given by Drs. Miran and Ghaus and did not properly weigh these opinions in accordance with the regulatory checklist of factors found in 20 C.F.R. § 404.1527(c). An ALJ must give controlling weight to a treating physician's opinion if it is both "well-supported" by medical evidence and "not inconsistent with the other substantial

---

[3] Claimant also initially challenged the ALJ's listing analysis, but he has withdrawn that challenge. (Dkt. 13 at 3-5; Dkt. 22 at 1.)

evidence" in the record.  *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); 20 C.F.R. §

404.1527(c)(2).[4]  Because a treating physician has "greater familiarity with the

claimant's condition and circumstances," an ALJ may only discount a treating

physician's opinion based on good reasons "supported by substantial evidence in the

record."  *See Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Gudgel v.*

*Barnhart,* 345 F.3d 467, 470 (7th Cir. 2003).

"Even if an ALJ gives good reasons for not giving controlling weight to a treating

physician's opinion, she has to decide what weight to give that opinion."  *Campbell*, 627

F.3d at 308.  To do this, the ALJ must, consider a variety of factors, including: (1) the

length of the treatment relationship and frequency of examination; (2) the nature and

extent of the treatment relationship; (3) the extent to which medical evidence supports

the opinion; (4) the degree to which the opinion is consistent with the entire record; (5)

whether the physician was a specialist in the relevant area; and (6) other factors that

validate or contradict the opinion.  *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir.

2014); 20 C.F.R. § 404.1527(c)(2)-(6).  "An inadequate evaluation of a treating

physician's opinion requires remand."  *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir.

2017).

### 1. Dr. Miran's Opinion

According to the Headache/Migraine Residual Functional Capacity questionnaire

completed by Dr. Miran in November 2013, Claimant experienced day-long migraines

two to three times per week and needed to lie down in a quiet room for six to eight

---

[4] In January 2017, the SSA adopted new rules for agency review of disability claims involving the treating physician rule.  *See* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844 (Jan. 18, 2017).  Because the new rules apply only to disability applications filed on or after March 27, 2017, they are not applicable in this case.  *See id.*

hours to rid himself of the migraine.  (R. 219.)  Dr. Miran also opined that Claimant might "need breaks at unpredictable intervals during" the workday and that he was likely to miss work more than four times per month due to his impairments or treatment.  (R. 220.)  If one or more of these restrictions had been incorporated into Claimant's RFC, employment would have been precluded.  (*See* R. 57-58 (VE testimony that employers tolerate one absence or less per month and off-task time of no more than 15 percent).)

The ALJ gave Dr. Miran's opinion "very little weight" because, as she saw it, "neither the reported frequency nor the severity of migraines [was] supported by the record."  (R. 24-25.)  In coming to this conclusion, the ALJ relied upon two DuPage Internal Medicine progress notes from April and July 2010.  (R. 25 (citing R. 428-29).)  According to the ALJ, the April 2010 note showed that Claimant was taking Imitrex[5] as needed and doing well regarding migraines, and the July 2010 note showed that Claimant's depression was stable and his headache was better.  (R. 24.)  The ALJ also referred to a May 2015 encounter note from Dr. Malik, which described Claimant's headaches as well controlled.  (*Id.* (citing R. 394-95).)

The Court, though, is hard-pressed to see how these notes shed any light on the frequency and severity of Claimant's migraines in and around November 2013, when Dr. Miran offered his opinion.  The DuPage Internal Medicine notes, recorded in mid-2010, predate Dr. Miran's treating relationship with Claimant by two years, and Dr. Miran's opinion by more than three years.  Much could have changed regarding Claimant's migraines by the time he started seeing Dr. Miran.  Indeed, why would Claimant present to Dr. Miran complaining of "throbbing" migraines in August 2012 if he

---

[5] Imitrex, also known as Sumatriptan, is "used to treat migraine headaches in adults."  Imitrex: Uses, Dosage, Side Effects, and Warnings, https://www.drugs.com/imitrex.html (last visited Nov. 19, 2018).

was still doing well or better with his headaches, as noted in the mid-2010 progress notes? (R. 279.) And even more could have changed by the time Dr. Miran offered his opinion in November 2013. Similarly, Claimant's headaches could have become controlled at any time in the roughly year and a half period between Dr. Miran's November 2013 opinion and Dr. Malik's May 2015 note, a period that, for the most part, postdates the December 31, 2013 DLI.

What is more, even if these notes reflected Claimant's condition at the relevant time, they at most give qualitative descriptions of Claimant's migraine symptoms (e.g., medication is "working well," headaches are "better," and migraines are "[w]ell controlled"). (R. 395, 428, 429.) These vague descriptions do not describe how often Claimant was experiencing his migraines or for how many hours each migraine, when experienced, lasted. More directly, these descriptions do not indicate whether Dr. Miran's opinion about these aspects of Claimant's migraine condition is, in fact, contradicted by or inconsistent with other medical evidence.

And even if the relied-upon medical notes could be seen to contradict Dr. Miran's opinion, that would simply mean that Dr. Miran's opinion was not entitled to controlling weight. *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (explaining that once there is evidence contradicting a treating physician's report, the "controlling weight" presumption "falls out"). Even if not controlling, Dr. Miran's opinion is "still entitled to deference." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996).[6] As such, the ALJ was required to address the checklist of factors found in 20 C.F.R. § 404.1527(c) to

---

[6] The SSA has rescinded SSR 96-2p in connection with its new rules governing the analysis of treating physicians' opinions, but that rescission is effective only for claims filed as of March 17, 2017. *See* Notice of Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 3928298, at *1 (Mar. 27, 2017).

determine what weight to give Dr. Miran's opinion. *See id.*; *Scrogham*, 765 F.3d at 697-98 & n.48 (explaining that the ALJ should have addressed the factors set forth in § 404.1527(c) and indicating that her failure to do so was not harmless); *Bauer*, 532 F.3d at 608 (noting that "the checklist comes into play" once an opinion is not given controlling weight).

There is no indication that the ALJ did so here. True, the ALJ's reliance on the notes from DuPage Internal Medicine and Dr. Malik suggests that she (at least somewhat) considered whether the evidence supported or was consistent with Dr. Miran's opinion, which are two relevant factors. *See* 20 C.F.R. § 404.1527(c)(3)-(4). But the Court is not convinced that plucking a handful of notes from mid-2010 and mid-2015 adequately addresses whether Dr. Miran's opinion is supported by relevant evidence and consistent with the record "as a whole." *See Scrogham*, 765 F.3d at 697. The Relevant Period for analyzing Claimant's disability claim is from his alleged disability onset date, July 15, 2010, to his DLI, December 31, 2013. (R. 18); *see Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) ("[T]he claimant must establish that he was disabled before the expiration of his insured status . . . to be eligible for disability insurance benefits."). Notes from around the beginning and well after the end of the Relevant Period do not say much, if anything, regarding Claimant's condition for the three-plus years *during* the Relevant Period. The ALJ also did not discuss or recognize Dr. Miran's status as Claimant's treating physician, or that when Dr. Miran offered his opinion, he had seen and examined Claimant four times over several months. (R. 24-25.) The ALJ should have considered these factors, which favor giving more weight to Dr. Miran's opinion. *See* 20 C.F.R. § 404.1527(c)(1), (c)(2)(i).

On appeal, the Commissioner puts forth additional reasons that purportedly justify the ALJ's decision to give Dr. Miran's opinion very little weight. She identifies an inconsistency between Plaintiff's testimony and Dr. Miran's opinion regarding the frequency of the migraines; the number of appointments with Dr. Miran where Claimant did not mention his migraines; and the opinions of the state agency consultants who disagreed with Dr. Miran's findings. (Dkt. 21 at 4-5.) But the Court's review is confined "to the rationale offered by the ALJ." *Scott*, 647 F.3d at 739. And the rationale the ALJ offered here for giving Dr. Miran's opinion very little weight did not mention any of the above reasons; instead, the ALJ relied on the frequency and severity of migraines reported by the three identified medical notes. (R. 24-25.) As such, the other reasons set forth by the Commissioner are not a proper basis to uphold the ALJ's decision. *Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015).

Ultimately, "[t]he ALJ's failure to sufficiently account for the factors in 20 C.F.R. § 404.1527 prevents the Court from assessing the reasonableness of the ALJ's decision" to give Dr. Miran's opinion "very little weight." *Jones-Verboom v. Berryhill*, No. 16 C 8457, 2018 WL 704692, at *10 (N.D. Ill. Feb. 5, 2018) (internal quotations and alteration omitted). Thus, the ALJ's evaluation was inadequate and her decision was not supported by substantial evidence, requiring remand. *Id.*; *Cullinan*, 878 F.3d at 605. On remand, the ALJ should re-evaluate the proper weight to give to Dr. Miran's opinion, specifically accounting for the factors set forth in 20 C.F.R. § 404.1527(c).

### 2. Dr. Ghaus's Opinion

In November 2013, Dr. Ghaus completed a medical source statement in which she opined that Claimant's depression met or equaled several aspects of a listed

impairment (Listing 12.04, Affective Disorders) that was "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." (R. 222-23.) One of these aspects included a current history of being unable, for one year or more, to function outside a highly supportive living arrangement. (R. 223.) Dr. Ghaus further explained that Claimant experienced high and debilitating levels of anxiety and chronic symptoms of depression, including depressed mood, hypersomnia, low energy, lack of motivation, low self-esteem, poor concentration, inability to make decisions, and an inability to function outside of his home. (R. 222-23.)

The ALJ gave Dr. Ghaus's opinion "little weight," finding that the serious limitations outlined in her opinion were "not supported by the medical evidence of record and by the extent of the claimant's daily activities." (R. 25.) Regarding the medical evidence, the ALJ cited notes from visits with Dr. Miran that showed no psychiatric symptoms, no unusual anxiety or evidence of depression, and full orientation and appropriate mood and affect. (*Id.* (citing R. 269, 283, 309).) She also reasoned that all the mental status evaluations performed by Dr. Ghaus reflected that Claimant was fully oriented, had normal motor activity and speech, and was appropriately groomed with good eye contact. (*Id.* (citing R. 287-300).) Specifically, the ALJ called out an August 2013 visit where Claimant was cooperative with normal grooming and eye contact, intact memory, and normal motor activity and speech, and a September 2013 visit where Claimant, although irritated, reported feeling better with a recent change in medications and that he was not experiencing any medication side effects. (*Id.* (citing R. 338).) The ALJ cited other medical records—an August 2013 emergency room visit and 2015 progress notes from Dr. Khaja—to similarly show instances where Claimant

exhibited appropriate mood and affect, normal grooming, cooperativeness, and other presumably normal findings. (*Id.* (citing R. 312, 315-27, 355, 370, 377).) The ALJ also reasoned that because Claimant's medication regimen was "essentially unchanged" and he reported no side effects from July 2012 to July 2013, this suggested that Claimant's "medications were helpful in ameliorating his symptoms." (*Id.* (citing R. 287-300).)

The ALJ's recitation of this medical evidence, however, reveals that she impermissibly cherry-picked evidence to support her unfavorable evaluation of Dr. Ghaus's opinion, while ignoring evidence that potentially supported Dr. Ghaus's opinion. *See, e.g.*, *Scott*, 647 F.3d at 739-40 (explaining that an ALJ cannot "cherry-pick" from mixed results in treatment notes to support a denial of benefits); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) (finding that the ALJ's conclusion that the claimant's mental findings were "essentially normal and intact" improperly ignored portions of notes indicating serious mental health issues). Although the mental status evaluations performed by Dr. Ghaus may have reflected that Claimant "was fully oriented, he had normal motor activity, normal speech, and he was appropriately groomed with good eye contact" (R. 25), the ALJ ignored that at many of the same evaluations, Claimant also exhibited moods, affects and other symptoms that were not so positive. As just some examples:

- In September 2012, despite exhibiting normal speech and intact orientation and memory, Claimant exhibited a depressed and anxious mood and affect, and poor insight. (R. 298.)

- In May 2013, despite full orientation and good eye contact, Claimant's mood was "depressed, frustrated, and angry," his anxiety had increased, and he had experienced a mild panic attack. (R. 291.)

- In July 2013, despite normal grooming, motor activity, and speech, as well as exhibiting intact memory and full orientation, Claimant's mood was anxious,

angry/hostile, and frustrated, his affect was angry and frustrated, and his insight was poor.  (R. 288.)

- In November 2013, despite normal grooming, eye contact, motor activity, and speech, as well as being cooperative and exhibiting intact memory and full orientation, Claimant's mood was "frustrated and angry," his affect was constricted, his insight was poor, and he reported sleeping until 4 p.m.  (R. 336.)

And at the September 2013 visit where Claimant felt better and was not experiencing any side effects from medication, Claimant was not merely irritated, as the ALJ recounted (R. 25); instead, he was also angry/hostile and sad, presented with a constricted affect, and exhibited poor insight.  (R. 338.)  Indeed, that Claimant was cooperative or exhibited normal motor activity, speech, grooming, eye contact, and orientation while, at the same time, exhibiting undesirable moods, affects, and other symptoms on so many occasions makes the Court question whether such observations were properly used to gauge Claimant's symptoms of anxiety and depression.[7]

Similarly, in finding that Claimant's "medication regimen was essentially unchanged" from July 2012 to July 2013 (R. 25), the ALJ overlooked the notations indicating that in April or May 2013, Claimant began taking Lamictal, a mood stabilizer presumably prescribed to treat Claimant's severe bipolar disorder.[8]  (R. 20, 291-93); By July 2013, just a few months later, Claimant's dosage had increased from 25 mg to 150 mg.  (R. 288-92.)  And by the time Dr. Ghaus gave her opinion in November 2013, Claimant was up to at least 200 mg of Lamictal.  (R. 336-39.)  The ALJ should have addressed these notations before rejecting Dr. Ghaus's opinion based on Claimant's

_____

[7] It is also unclear why the ALJ believed that the DuPage County progress notes from February 2015 through August 2015 undermined Dr. Ghaus's opinion (R. 25), which was offered in November 2013, more than a year before.

[8] Lamotrigine (Lamictal), NAMI: National Alliance on Mental Illness, https://www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Types-of-Medication/Lamotrigine-(Lamictal) (last visited Nov. 19, 2018) (explaining that Lamictal is approved for the treatment of bipolar disorder).

"essentially unchanged" medication regimen. *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected.").

As with Dr. Miran's opinion, the ALJ also failed to address the appropriate regulatory factors to determine what weight to give Dr. Ghaus's opinion. *See Scrogham*, 765 F.3d at 697-98 & n.48; SSR 96-2p, 1996 WL 374188, at *4. For example, the ALJ did not acknowledge Dr. Ghaus's treating and examining relationship with Claimant or that Dr. Ghaus had examined Claimant approximately 18 times by the time she offered her November 2013 opinion. (R. 288-300, 336-39.) Nor did the ALJ acknowledge that Dr. Ghaus was a psychiatrist who was specifically treating Claimant's depression. (R. 190, 223.) These factors all weigh in favor of giving Dr. Ghaus's opinion greater weight. *See* 20 C.F.R. § 404.1527(c)(1), (c)(2)(i)-(ii), (c)(5). Relatedly, in discounting Dr. Ghaus's opinion based on the observations of Dr. Miran (see R. 25 (citing R. 269, 283, 309)), the ALJ failed to appreciate that, because of Dr. Ghaus's specialty and the nature of her treating relationship with Claimant, her observations regarding Claimant's mental state should generally outweigh those of Dr. Miran, who is not a psychiatrist and who was not treating Claimant for depression. *See Kelly v. Colvin*, No. 14 C 1086, 2015 WL 4730119, at *6 (N.D. Ill. Aug. 10, 2015) (indicating that a psychiatrist's opinion should be given greater weight than an internal medicine specialist's opinion).

This is not to say that the ALJ was required to adopt Dr. Ghaus's opinion wholesale. *See Reyes v. Colvin*, No. 14 C 7359, 2015 WL 6164953, at *13 (N.D. Ill. Oct. 20, 2015) ("[A]n ALJ may choose to adopt only parts of a medical opinion[.]")

(internal quotations and alteration omitted).  The ALJ reasonably determined that Dr.

Ghaus's opinion that Claimant is *unable* to function outside of his house is seemingly

contradicted by Claimant's ability to drive, go out alone, run errands, and drive to

Arizona with his friend for a week.  (R. 25, 223.)  But although this inconsistency can be

considered by the ALJ on remand in evaluating Dr. Ghaus's opinion, see 20 C.F.R. §

404.1527(c)(4), it should be considered in the context of all the other factors of §

404.1527(c).

On this record, the ALJ failed to provide adequate analysis and substantial

evidence supporting her decision to give Dr. Ghaus's opinion "little weight," which

requires remand.  *See Cullinan*, 878 F.3d at 605; *Jones-Verboom*, 2018 WL 704692, at

*10.  On remand, the ALJ should re-evaluate the proper weight to give to Dr. Ghaus's

opinion, specifically accounting for the factors set forth in 20 C.F.R. § 404.1527(c).  In

remanding the case, the Court also notes that many portions of Dr. Ghaus's progress

notes are not entirely legible, and the ALJ should consider whether it is appropriate to

contact Dr. Ghaus to obtain more legible copies or an explanation of the progress notes

in the record.  *See, e.g.*, *Koppers v. Colvin*, No. 15 C 5471, 2016 WL 3136916, at *4

(N.D. Ill. June 6, 2016) (where a doctor's notes were largely illegible, finding that the

ALJ had a duty on remand to recontact the doctor to "request legible copies of his notes

. . . or an explanation of the findings contained therein"); *Torres v. Colvin*, No. 2:13-CV-

125-PRC, 2014 WL 4587153, at *15 (N.D. Ind. Sept. 15, 2014) (finding that the ALJ

should have contacted the claimant's treating physician for clarification of the

physician's difficult-to-read treatment records).

### D.  On Remand, the ALJ Should Re-Evaluate Plaintiff's Allegations About His Symptoms in Accordance with SSR 16-3p.

Claimant also contends that the ALJ erred in assessing his credibility and subjective symptoms. As this case is already being remanded on other grounds, the Court need not explore this contention in detail, as it would not change the result in this case. Nonetheless, the Court believes it is appropriate for the ALJ to re-evaluate Claimant's subjective symptoms (i.e., Claimant's own description of his impairments) on remand in accordance with SSR 16-3p.[9] Under SSR 16-3p, the ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce" Claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16, 2016). Then, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [Claimant's] ability to perform work-related activities." *Id.*

On remand, the ALJ should bear in mind the following principles with respect to her SSR 16-3p evaluation. First, Claimant is seeking DIB; thus, the evaluation should focus on Claimant's symptoms during the Relevant Period, i.e., from his alleged disability onset date, July 15, 2010, to his DLI, December 31, 2013. *Cf. Shideler*, 688 F.3d at 311 (explaining that to be eligible for DIB, "the claimant must establish that he was disabled before the expiration of his insured status"). Medical records post-dating the Relevant Period by a significant amount of time, such as many of the 2015 records cited by the ALJ in her current symptom evaluation (see R. 24), may not accurately

---

[9] Although SSR 96-7p governed at the time of the ALJ's February 3, 2016 decision, it has since been superseded by SSR 16-3p, which applies to ALJ decisions issued on or after March 28, 2016. *See Alesia v. Berryhill*, 2018 WL 3920534, at *8 n.5 (N.D. Ill. Aug. 16, 2018). Nonetheless, because this Court is remanding the case for further proceedings that will take place after March 28, 2016, the ALJ's decision on remand should apply SSR 16-3p to the entire period at issue. *See* Notice of Social Security Ruling, 82 Fed. Reg. 49462-03, 2017 WL 4790249, at n.27 (Oct. 25, 2017).

reflect Claimant's symptoms during the Relevant Period.  *See Million v. Astrue*, 260 F. App'x 918, 921–22 (7th Cir. 2008) (explaining that post-DLI medical evidence is relevant only to the extent that it "shed[s] light on [a claimant's] impairments and disabilities from the relevant insured period").  Nor would Claimant's December 2015 testimony (or any testimony on remand) as to his symptoms *at the time of the hearing* necessarily shed any light on his symptoms during the Relevant Period.  On remand, the ALJ should ensure to develop Claimant's testimony as to his symptoms during the Relevant Period. And if the ALJ relies upon post-Relevant Period medical records or other evidence for her subjective symptom evaluation, she should explain how and why this evidence reflects the intensity and persistence of Claimant's symptoms during the Relevant Period.

Second, the ALJ should ensure that her subjective symptom evaluation is supported by a discussion of "specific reasons supported by the record," especially if she does not believe Claimant's allegations.  *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Mueller v. Colvin*, 524 F. App'x 282, 285 (7th Cir. 2013).  The ALJ should explain her evaluation "in such a way that allows [the Court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record."  *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2014). This requires the ALJ to give reasons that "build an accurate and logical bridge between the evidence" and her subjective symptom evaluation.  *Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir. 2000) (internal quotations omitted).[10]

---

[10] The Court notes that, on remand, the ALJ should reconsider her finding that Claimant reported "doing martial arts with a friend."  (R. 24.)  Claimant reported that he was "[c]onsidering starting a martial arts business with his friend," which is not the same as physically engaging in martial arts.  (R. 299.)

23

**III. Conclusion**

For the foregoing reasons, Claimant's motion for summary judgment (Dkt. 12) is granted insofar as it requests remand for further proceedings, and the Commissioner's motion for summary judgment (Dkt. 20) is denied.  This case is remanded to the SSA for proceedings consistent with this Opinion.  It is so ordered.

**DATED:  December 18, 2018**

**Magistrate Judge Michael T. Mason**